Nott, J.,
dissenting:
It is evident that this action can only he sustained upon contract, express or implied. The acts of the government are never torts, and for the torts of its officers the government is never liable. It is determined also by the decisions of this court (Jones and Broum’s Case, 1 C. Cls. R., p. 383) that the government in its character of contractor is not liable for its general and public acts done in its character of sovereign. These principles, clear and simple in themselves, are not always easy of application; and it is advisable, therefore, in the present involved case to ascertain precisely what it was for which the government is supposed to be liable under its contract.
*200 The right to trade with the insurrectionary districts was not a free or general right open to all citizens. On the contrary, it was a privilege granted by the government, and the license constituted of itself a consideration. There was also a number of conditions imposed upon the traffic. A party was not free to dispose of its products. The government was to be the exclusive purchaser at a price less than the market value, determinable at the time of delivery. Congress also had enacted that the liability arising upon such sales should not constitute a general indebtedness of the United States. “No part of the purchase money” (is the language of the act) “shall be paid, or agreed to be-laid, out of any other fund than that arising from property sold as captured or abandoned.” — (Act 2d July, 1864, § 8, 13 Stat. L., 375.) The President, in his general orders of 24th September, 1864, carefully guarded against a trade in 11 articles contraband of war,” or “prohibited by the order of theWar Department.” The regulations of the treasury provided expressly that “no liability of any character shall be authorized or assumed by any agent for or on account of government previous to the actual delivery of the produets, other than a stipulation in the form hereinafter prescribed, to purchase products owned or controlled by applicants at a price to he agreed upon, at the flotee and date of delivery”
All of these regulations bound the claimant and limited any agreement into which the agents of the government might enter.
The “general regulations” of the Treasury Department also provided that—
“VIII. Whenever any person shallmahe application to the purchasing agent in writing, setting forth that he owns or controls products, stating the kind, quantity, and location thereof, or the date at which they will be delivered at some specified location accessible to transportation, the purchasing agent, if authorized by special instructions to purchase such products, shall give a certificate that such application has been made, and request safe conduct for such party, with the necessary transportation, to the locations specified, and for himself and products in transitu from the points named to such purchasing agent.”
And the certificate given by the purchasing agent to the claimant said:
“I have agreed to purchase from G. W. Lane, of Norfolk, Virginia, one thousand bales of cotton, which products it is represented are, or will be, at Chowan river, in the State of North Carolina, on the first day of January, 1865, and which he stipulates shall be delivered tome, unless prevented from so doing by the authority of the United States. *201 I therefore request safe conduct for the said G. W. Lane, and his means of transportation of said products.”
The regulation of the treasury did not contemplate an agreement, but rather indicates that a certificate was to be given, showing that an application had been received, and requesting that a safe conduct should be granted. The certificate given slightly exceeds these very plain and simple hounds in saying, “I have agreed to purchase,” but it does not say “I have purchased;” neither does it express a consideration, nor profess to hind the government in anything; but, on the contrary, after requesting- a safe conduct from the Chowan river to Norfolk, adds, “where the products so transported are to be sold and delivered to me under the stipulation referred to above, and pursuant to regulations prescribed by the Secretary of the Treasury.”
There would seem to be, therefore, on the part of the government, nothing given except a naked grant or permit allowing the claimant to go to a certain place and bring out a certain product; or, at most, an agreement to purchase the product if the claimant should succeed in bringing it out. On the part of the claimant there would seem to be an express agreement in consideration of the permit to go to the place named and bring out the product designated, “unless prevented from so doing by the authority of the United States.”
It might be claimed by the defendants that this exception recognized an authority in the United States to prevent him from performing his agreement. Such a clause was not necessary, unless that authority existed. It was an acknowledgment that the government had authority to revoke the permit, and that it was to be subservient to the military events which were transpiring in the country. If there had been any express or implied warranty on the part of the government, any agreement that the claimant should proceed unmolested, such a provision would have been wholly needless. But without going so far, the excepting clause aids us to construe the contract. It shows that the government assumed nothing. The right to purchase the cotton at three-fourths of its actual value, from the nature of things, was a privilege reserved, and not an obligation assumed. Care and caution of no ordinary degree seem to have been exercised by both the legislative and executive branches of the government to avoid involving the defendants in any possible liability growing out of this insurrectionary traffic. The privileges granted were few, the profits accruing were great; the parties seeking them assumed the risks and chances of the adventure; the government assumed nothing; or at most assumed an obligation to purchase at less than the market value when the success *202 ful trader should have brought the products of the trade into the appointed mart.
The agreement has been considered thus far without reference to the appointment of Upton or the safe conduct of General Shepley. As to the former, its terms and directions, its authority to receive and its direction to hold the cotton, were neither required by the regulations of treasury nor authorized by law. Neither does it appear that this appointment of a supercargo was ever shown to the claimant, nor that the instructions were made a part of the agreement, though it does appear that he accompanied the vessel, and that his authority was recognized by the claimant. His appointment must, therefore, he regarded as an additional limitation imposed on the claimant, and the character in which he went that of an inspector or police agent, rather than that of a supercargo or commercial representative. The object in sending him seems to have been to guard against any abuse of the safe conduct by the claimant, and so far was commendable. As to the safe conduct of General Shepley, it did not emanate from a commercial or financial officer of the government; and a military order of this nature could not have bound the government, financially, by any terms which the officer issuing it chose to employ. Neither were its terms in any way incorporated into or made a part of the original agreement. Both the regulations of the treasury and the certificate given to the claimant allude to the safe conduct as a thing to be “requested,” and neither recognizes it as a thing for which the government had contracted, or by which it would he bound.
The position taken during the argument which received the chief attention of the counsel, and, indeed, furnished the principal question discussed, related to the action of the navy in seizing the vessel, and therein, to the violation of a contract by the government, which, it was assumed, did exist. The counsel for the claimant maintained that the act of a high officer, invested with great discretionary powers, as was Admiral Porter, was in legal effect the act of the government, and he cited the case of Buron v. Denman, in 2 Excheq. B.., p. 167. The Assistant Solicitor for the United States, on the contrary, maintained that the case in 2 Exchequer does not apply, because there the action of the officer was sanctioned by his government, and in pursuance of its policy; while here, the action of the navy was in defiance of the orders of the government and contrary to its policy. In short, the broad ground was taken by the Assistant Solicitor that the acts of the naval officers were illegal.
I do not think so. The final seizure and detention of the vessel *203 was by tbe order of Admiral Porter, and tbe question consequently is, “upon wbat information or state of facts did be decide?” It is immaterial bow tbe facts appear to us; tbe question is, bow did they appear to bim ?
Tbe record in tbe case shows that tbe steamer was first reported as having run up tbe Chowan river in tbe night, and that ‘‘ on Tier way up a guard of rebel soldiers was placed on board Tier to take her wp in safety.” This of itself, as it appeared in the report, was good ground for capture, for neither her permit, nor tbe general order of tbe President, nor the acts of Congress excused or sanctioned breaches of military law. She was next reported as having passes and certificates in accordance with tbe general order regulating tbe traffic, and as having “ violated that order by having on board as part of her cargo hoots, shoes, and supplies of all lands, all of which are,” says Commander Macomb, “in my opinion, contraband of war!’
By these reports, whether true or false, tbe duty of tbe admiral, I think, was analogous to that of a civil magistrate, who, on a complaint which confers jurisdiction, commits an innocent person for trial. However false may be the complaint, or however erroneous may be tbe judicial discretion of the officer, so long as tbe papers make out a prima facie case of tbe crime for which the prisoner is held, so long tbe officer is protected in tbe exercise of bis discretion by tbe law. Neither is it within tbe province of the committing magistrate to reconsider bis decision. When tbe commitment is made the case passes out of bis jurisdiction, and tbe prisoner’s innocence must be determined by another tribunal. Precisely thus was the duty of tbe admiral. When be bad determined on tbe evidence before bim that tbe vessel was liable to seizure, it became bis duty to turn her over to tbe Treasury Department for further investigation or final adjudication, and this be did.
With regard to Commander Macomb, bis reports appear to have been erroneous, but not wilfully false. Tbe Philadelphia appeared to bim to have “ eluded the fleet while they were up the Roanoke,” and to have “slipped up Chowan river” during their absence. She then appeared to be bolding direct treasonable communication with tbe armed forces of tbe enemy, and finally was captured bearing tbe evidence, as be thought, of having carried contraband goods directly to that enemy. His good faith is evidenced by tbe fact that be allowed tbe Philadelphia to proceed without waiting for a positive order to that effect, so soon as tbe unverified schedule, which be deemed a suspicious paper, was signed and approved by General Sbepley. Therefore, I think, the good faith of both Admiral Porter and Commander Macomb should *204 not be called in question, and that however innocent the claimant may now appear to us, there did appear to them probable cause for holding him and his property for further examination.
But a majority of my brethren think differently. They believe these acts were unwarrantable, not malicious, but prompted by mistaken zeal; and it is said, “ Two courses were open to the executive department of the government — either to adopt the acts of seizure by retaining the property, or to restore it to the claimant.”
The second course thus indicated, in my understanding of the facts, was precisely that which the government did pursue. It did give up the cotton, and it gave it up in the precise manner pointed out and required by law.
The Treasury Department was charged by law with the custody of property liable to confiscation captured on inland waters. It was also the department that had contracted with the claimant. Therefore it rested with the Treasury Department to ratify the acts of the naval officers and deny to the claimant any further interest in his property, or to restore that property to him. But before restoring it some investigation was necessary. The claimant might be absolutely innocent, but his innocence could not be positively known to the Treasury Department. He stood charged with the commission of a crime, and if he were guilty, his cotton was legally captured property. It was therefore clearly the duty of the Secretary, on the one hand, to avoid treating this cotton as property delivered under the claimant’s contract, and, on the other hand, to investigate the facts of the case and redress, so far as possible, the claimant’s wrongs if he were innocent. Now what did the Secretary do ?
On the 3d or 4th of March the cotton “ was regularly turned, over” to the agent of the sixth agency “ as captured property by Commander Macomb,” On the 15th of March, the Secretary of the Treasury wrote to the agent that if the vessel had been placed in his possession “ charged with actual or intended violation of the acts of Congress or the regulations of the Treasury Department,” “ to cause it to be taken to some port within a district where an information may be filed and the rights of .all parties may be decided by a court having legal jurisdiction.” Considering the many affairs of a great government always pressing upon the Secretary of the Treasury, considering that this was in the last and most trying financial year of the waf, this letter shows a prompt and commendable desire to save and secure the legal rights of the claimant. Before the letter reached the agent, he had unloaded the cotton on account of the leaky and unseaworthy condition of the *205 Philadelphia, and a part of it had been already shipped to New York. He therefore determined to ship the balance to New York, “ where the rights of the government and of all claimants,” as he said, “ may he fully tried,” and to send the vessel to Norfolk.
Under the circumstances, I do not perceive that a wiser or more judicious course could have been adopted. When the vessel came within the jurisdiction of the district court for the District of Columbia, she appears to have been promptly libelled. It was hardly necessary to commence a second suit against the cotton; for the decision made with regard to the vessel would determine all questions with regard to the cargo. The Secretary might now have waited for the decision of the district court before taking further action in the claimant’s case. But instead of so waiting, he ordered, June 24, an investigation to be made by one of his agents. Thd report of the agent bears date the 10th July, and on the 11th the Secretary ordered that all of the cotton be given up to the claimant.
Up to this time it seems to have been understood by the agents of the government that no liability had been incurred by the defendants, and, on the contrary, that they might still exact from the claimant a compliance with the letter of his stipulation. The agent accordingly in this report recommends : “As Mr. Lane was prevented without any apparent fault from delivering it, until restrictions are removed, and as he is already a great sufferer by the fall in cotton while detained by the agents of the government, it would he unjust torequire him to carry o%it the stipulations under which he was transporting it at the time of seizure, and Irespectfully recommend that Messrs. Murray and Nephew he directed to deliver him the cotton on payment of all charges for transportation.” And the Secretary upon this report and recommendation decides : “After a full consideration of the case I have decided to grant the prayer of the petitioner; and yoir are therefore hereby authorized and directed to deliver to Mr. Lane, or his duly empowered attorney, the said cotton on the payment by him of all lawful and ■proper expenses incurred in handling, transportation, and care of the same, and on the execution hy him of a payer which will protect you and all officers of the government from any legal action for the part taken in the premises.”
I am satisfied that from whatever side we approach this case, no cause of action can be found against the defendants. The evidence discloses no intent on the part of the government, or its officers, to violate any contract into which .it had entered. The acts complained of were not designed to be an evasion of the contract, but were an exercise of those *206 sovereign powers with which all governments are invested and to which all citizens are liable. The claimant’s case is a hard one, hut it is simply the case of an innocent citizen, charged with a criminal act by a mistaken witness, committed for trial by a magistrate, indicted by a grand jury, and finally honorably acquitted by the proper tribunal. For such misfortunes the law gives no redress, and this case gains nothing because it was the property and not the person that was seized. When such wrongs are committed without malice they must be borne by those upon whom they fall.
Finally, I think that no attempt can be imputed here, either to the government or its agents, to impair or destroy the claimant’s rights. The officers of the Treasury Department, in each instance, avowed a desire to secure to the claimant his legal rights, and proceeded to have them adjudicated in the precise manner pointed out by law. The real grievance of the claimant lies in the fact that between the 3d day of March, when the cotton came into the possession of the Treasury Department, and the 27th day of April, when it arrived at New York, the great war of the rebellion had ceased, and the value of the cotton had irretrievably fallen.
Loring, J., concurred in the conclusion that the defendants are entitled to judgment.